# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

SVETLANA GITERMAN,                  :

                                    :

    **Plaintiff**                    :          CIVIL ACTION NO. 3:16-0402

                                    :

    **v.**                          :

                                    :          **(JUDGE MANNION)**

**POCONO MEDICAL CENTER,**           :
***et al.*,**

                                    :

    **Defendants**                 :

## M E M O R A N D U M

    Plaintiff Svetlana Giterman, who is totally deaf, filed this action asserting claims against defendants Pocono Medical Center and Pocono Health System (collectively referred to as "PMC") under Title III of the Americans with Disabilities Act ("ADA") and §504 of the Rehabilitation Act of 1973 ("RA"). Plaintiff alleges that PMC intentionally discriminated against her due to her hearing disability and that it failed to provide her with "auxiliary aids and services", including an interpreter, to allow her to effectively communicate about her medical treatment during two separate visits to PMC's emergency department in March and July of 2014 for fractures to her right ankle. PMC contends that it did not discriminate against plaintiff and that plaintiff was able to effectively communicate about her medical treatment during both visits. Plaintiff also asserts disability discrimination claims against defendant Whitestone Healthcare Group, LLC d/b/a Whitestone Care Center ("WCC"), under Title III of the ADA and §504 of the RA, arising in July 2014, when she

was brought from PMC to WCC for physical therapy. Defendants filed motions for summary judgment pursuant to [Fed.R.Civ.P. 56](#) with respect to the ADA and RA claims raised by plaintiff against them in her amended complaint. (Docs. 51 & 55). Plaintiff filed a cross-motion for summary judgment against the defendants. (Doc. 64). For the following reasons, the defendants' motions for summary judgment will be **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's motion for summary judgment will be **DENIED**.

## I.    MATERIAL FACTS[1]

### Plaintiff's Background

Plaintiff, an adult, has been totally deaf since age 9. As a result, there is no dispute that plaintiff has a hearing disability for which she is entitled to protection from discrimination under federal laws, including the ADA and the RA.

Plaintiff moved from the Ukraine at age 19. Plaintiff resides in the Poconos and she obtained her GED in 1984 through written tests without the need for any accommodation. Plaintiff communicates primarily in American Sign Language ("ASL") and this is her preferred method of communication. However, plaintiff can read and write English, and occasionally writes to

---

[1]The material facts are derived from PMC's, WCC's and plaintiff's statement of facts, the responses to the statements filed by the parties, and the exhibits filed by the parties. The court only includes facts material to the issues in the case supported by the record, and it does not include legal conclusions.

communicate. Plaintiff also uses text messaging as well as emails to communicate and she uses an iPad to read the news. Plaintiff can also lipread but her ability to do so is poor.

Plaintiff was employed in a data entry job with a New York school district from 1985 to 2001. She is currently not employed.

Plaintiff is able to drive and she is able to understand road signs. She also watches television by using closed captioning.

Plaintiff's expert, Judy Shepard Kegl, a Ph.D. in Linguistics and a certified ASL interpreter, opines that in order to have sufficient communicative access to medical services, plaintiff requires the services of a professional interpreter, and that any interpreter fluent in ASL would suffice. Dr. Kegl also indicated that plaintiff has the ability to lipread with a 33% comprehension rate.

### Plaintiff's March 2014 Treatment at PMC

On March 8, 2014, plaintiff fractured her right ankle while she was exercising at home and she was transported by ambulance to the PMC Emergency Department. Plaintiff's son, Joseph Giterman, who is fluent in American Sign Language ("ASL") but not certified, accompanied his mother at PMC. Additionally, Joseph Giterman worked as an ASL interpreter from 1998 to 2010, and he admitted that his ability to communicate with his mother by ASL is "very good." Both plaintiff and her son requested a live interpreter to communicate with her. Plaintiff and her son were told by PMC staff that an

interpreter was coming, but one never arrived. Rather, plaintiff was provided a Deaf Talk Video Remote Interpreting ("VRI") services computer to communicate with the staff. PMC's medical record indicates that the emergency doctor was able to communicate with plaintiff using the VRI machine.

Plaintiff's friend, Sharon Antal, also arrived at PMC on March 8, 2014, and requested an interpreter for plaintiff. However, no interpreter was provided and PMC staff indicated that they could not get an interpreter. Thus, PMC relied on the VRI machine to communicate with plaintiff.

Plaintiff and Antal testified that the VRI machine was not functioning properly and that it kept freezing and disconnecting. Plaintiff also stated that it was "blurry and very hard to see because it was off to the side." When Joseph Giterman complained to staff the machine was not working, he was told by staff that they would rely on family members to communicate with plaintiff.

Joseph requested a live interpreter for his mother and indicated that he did not want to be responsible for interpreting for her with respect to her medical treatment. The charge nurse was advised of Joseph's request and indicated that she would get an interpreter. PMC staff then used Deaf Talk video interpreter on a computer, i.e., the VRI machine, to speak with plaintiff about her surgery and what to expect.

The nurse's note indicated that plaintiff was able to conduct a conversation with a nurse using the VRI machine. The nurse explained to

4

plaintiff that she had a broken ankle and that a soft cast was going to be applied to it temporarily. Plaintiff was also advised about the surgery that would be required and she was given an opportunity to ask questions. The nurse's note stated that the video interpreter indicated that plaintiff was aware of the procedure to be performed on her ankle and what to expect.

Before any treatment began on March 8, plaintiff was given a "Consent to Medical And/Or Surgical Treatment" form. The plaintiff was explained the purpose of the form and she signed the form when she was asked to do so. PMC's record indicates that when plaintiff was asked to sign the March 8, 2014 consent form, she was asked, "[s]o you understood what you were signing when you signed it?", and that plaintiff answered "yes". The nurse also explained to plaintiff what was going to occur after the cast was applied to her ankle. The doctor's note indicated that "video interpreter using sign language translated. [Patient] consents to reduction of right ankle, acknowledges the risk of conscious sedation." Nonetheless, plaintiff testified that she really did not understand the language on the form and that it was not clear to her.

In contrast to PMC's evidence, plaintiff testified that she could not have a meaningful discussion with either the nurse or the doctor on March 8 by using the VRI machine since it kept disconnecting and that her son had to try and interpret for her. Plaintiff's son also stated that since his mother did not have a live interpreter, he had to ask PMC staff his mother's questions about her treatment. Plaintiff also testified that she was unable to have a discussion with the Physician's Assistant at PMC due to the malfunctioning VRI machine.

5

Plaintiff was discharged from PMC later on March 8, 2014. PMC staff did not utilize a live interpreter or the VRI machine to give plaintiff her discharge instructions. Rather, a nurse printed out a paper with the discharge instructions and provided it to plaintiff along with a discharge form. PMC staff then relied upon plaintiff's son to help interpret the discharge instructions and form. Plaintiff admitted that the nurse went through the discharge instructions pointing out important parts and that she understood the instructions. However, plaintiff also testified that she did not understand all of the instructions without the aid of interpreter. Nonetheless, plaintiff signed the discharge form.

On March 17, 2014, plaintiff returned to PMC for a pre-surgical exam regarding her ankle. Plaintiff was provided with a live interpreter and she stated that she was "very happy" with the interpreter and that the communication regarding her treatment was "very clear." Plaintiff then had surgery on her ankle at PMC on March 17, 2014. Plaintiff had a "smooth recovery" from her March 8, 2014 right ankle fracture and it was free of any complications.

### Plaintiff's July 2014 Treatment at PMC

On July 3, 2014, plaintiff was involved in an automobile accident and she was transported by ambulance to PMC for treatment. As a result of the accident, plaintiff again fractured her right ankle. PMC did not provide plaintiff with a live interpreter upon her arrival. A nurse advised plaintiff by a note that

6

her ankle was broken. Plaintiff stated that PMC offered her a VRI machine to converse with her, but she stated that a problem occurred with the Wi-Fi connection. Plaintiff's son, Joseph, was again present at PMC and he signed in for his mother and translated. He also verified that the VRI machine was not working. PMC staff, including the orthopedic surgeon, Dr. Stefan Sinco, the attending orthopedic surgeon, then relied upon Joseph to interpret for his mother. Joseph was able to interpret for plaintiff the staff's discussion regarding her treatment, including the administration of medication for her pain. However, both plaintiff and her son requested that Dr. Sinco provide her with an interpreter. Plaintiff stated that a nurse tried to get a live interpreter, but the nurse was not able to obtain one.

On July 3, 2014, Dr. Sinco explained to plaintiff, through her son as the interpreter, that she needed surgery on her right ankle, and he told plaintiff that it was scheduled for July 4, 2014. Dr. Sinco provided plaintiff with a surgery plan which was explained to her by her son. Plaintiff's son also explained the consent form for her surgery but he stated that he did not recall explaining any of the risks to her associated with the ankle surgery. Plaintiff testified that PMC staff never explained the risks to her regarding her surgery, but she admitted that she understood, through her son, that on July 4 she was going to have an open reduction of her ankle.

A July 3, 2014 note documenting plaintiff's pre-surgery consultation with Dr. Sinco indicates that the doctor obtained "informed verbal consent" from plaintiff, and that he gave plaintiff a consent for the surgery, filled it out and

let her read it since her son had left the hospital for the day. Specifically, the note stated that, "[w]e gave her the consent for the procedure, filled it out and let her read thoroughly as she is deaf and her son has left for the day. I [Dr. Sinco] gave her a piece of paper and let her ask questions on the paper, and we went back and forth writing to make sure that she understood everything that was planned, and she then went ahead and signed the consent." Dr. Sinco also testified that plaintiff's surgery was "urgent."

Dr. Sinco did not provide plaintiff with an interpreter regarding the consent form, rather, as indicated, he wrote down the plan for her surgery. Dr. Sinco testified that he has never used a sign language interpreter or VRI machine to communicate at PMC, and that he is not aware of PMC's official procedures for obtaining in-person sign language interpreters. Dr. Sinco also stated that plaintiff was the only deaf patient that he ever encountered.

PMC presented evidence to show that plaintiff understood what Dr. Sinco was telling her regarding her treatment, and that plaintiff indicated she understood her condition and that the surgery was required. In fact, plaintiff testified that on July 3, 2014, Dr. Sinco explained to her that she required an open reduction of her right ankle, which would occur on July 4th and, she admitted that she understood Dr. Sinco as well as her condition and the surgery that was planned. Plaintiff then had surgery on her ankle on July 4th.

About one hour before her surgery, plaintiff used the Deaf Talk services application provided by PMC and an ASL interpreter was utilized for 4.5 minutes.

8

After her surgery, PMC staff gave plaintiff a laptop to use the Deaf Talk services application, but the Wi-Fi connection would not work.

Plaintiff stated that Dr. Sinco did not provide an interpreter for her when he met with her after surgery and that he used a board on the wall in her room to draw a picture in order to explain her surgery. However, Dr. Sinco testified that he did "not typically" meet with patients post surgery, PMC has no record indicating that Dr. Sinco met with plaintiff post surgery. Rather, the post surgical nursing notes indicate that the nurse spoke with plaintiff post surgery.

As a result of the vehicle accident, plaintiff was hospitalized at PMC in total from July 3, 2014 to July 8, 2014. During her hospitalization, nurse Michael Hennigan would rely upon plaintiff's son to interpret for his mother while he conducted a systems assessment of plaintiff. Hennigan testified he could not recall if he used a deaf talk machine or an interpreter, other than plaintiff's son Joseph for small talk, during his assessment of plaintiff. However, Hennigan testified that he would not use a family member to interpret anything medical for him, and that if an interpreter request were made he would honor the request.

Plaintiff also testified that during her hospitalization at PMC, she requested a live interpreter every day to different nurses by written notes. She stated that the nurses indicated that they would try to get her an interpreter, but she was never provided with one. Plaintiff further stated that while she was at PMC, staff did not explain the type, purpose, dosage, or side effects of the pain medications that she was prescribed.

Plaintiff was discharged from PMC on July 8, 2014, and she was transferred to WCC for physical therapy. Plaintiff signed a Consent to Transfer Form before she was transferred and checked the box indicating that she consented to the transfer. Plaintiff testified that she understood she was being transferred to rehab and, that purpose of the transfer was to rehab her ankle. However, plaintiff stated that she was not provided with an interpreter to explain the form, despite her request for one, and that her son was not present at the time. She also stated that PMC staff tried to explain the form by writing a note for plaintiff asking her whether she agreed to the transfer.

Additionally, prior to her discharge at PMC, a discharge planning meeting was conducted with plaintiff by Elizabeth Felletter, a case manager. Felletter indicated in a July 7, 2014 note in plaintiff's medical records that she "was unable to hold an interview with [patient], since the patient was deaf." The note also indicated Felletter called plaintiff's son Joseph to assist with the discharge assessment of plaintiff, but Joseph was not able to be present when his mother was being discharged. Plaintiff then signed a discharge instruction receipt indicating that she understood the instructions.

Felletter did not use an interpreter for the discharge planning meeting with plaintiff. Felletter also testified that she was trained that PMC would provide an interpreter if a patient requests one or if a family member or friend is not present to interpret. Felletter further testified she had yearly training with respect to providing interpretation services and that the training consists of "online training that includes how to get the resources for the interpreter."

Plaintiff testified that PMC staff did not explain her discharge instructions and that staff failed to use either a live interpreter or a VRI machine to give her discharge instructions.

Plaintiff recovered well and without complications after her July 4th surgery at PMC.

Plaintiff testified that has no definitive plans to return to PMC in the future, but stated that she it was possible that she would return to PMC if it provided her with an interpreter. Plaintiff has not been to PMC since she was discharged o July 8, 2014.

During the relevant times of this case, PMC had a 3-year contract for Video Interpreting Services with Deaf-Talk, Inc., d/b/a DT Interpreting, for ASL VRI services, which commenced on May 21, 2013. Also, during the relevant times, PMC had a contract with Lehigh Valley Center for Independent Living, to provide live ASL interpreters as needed. Mary Jackson, director of Lehigh Valley Center and PMC's Rule 30(b)(6) witness, testified that pursuant to PMC's contract every patient at PMC gets a nursing assessment and if they are identified as "hearing-impaired", they are asked about their method of communication. Jackson also testified that pursuant to PMC's written policies, an interpreter must be provided in various circumstances, including "obtaining medical history, explaining the patient care and periodic updated on the plan of care, discharge planning discussion, explaining procedures." Jackson also stated that an interpreter had to be provided any time that a patient requests one. Further, Jackson testified that "it is not advisable to use family members

to interpret because they may not accurately represent what's being communicated."

PMC's policies also provided that the Case Management Department "[m]aintains appropriate contracts with agencies to provide interpretive services", and that the nursing staff "[m]aintains oversight for appropriate equipment utilized for translation services at PMC Acute Care Facility." It further provided that PMC staff was to "determine the need for Language, Video or Face to Face translation."

Subsequent to 2014, PMC has added additional computers to provide better access to VRI services at its facility.


### Plaintiff's Physical Therapy at WCC

On July 8, 2014, plaintiff was transferred from PMC to WCC for physical therapy after surgery on her right ankle. Plaintiff's medical records from WCC indicated that "patient does not speak due to deafness in both ears."

Upon her arrival at WCC, plaintiff was provided with a pad and pen to communicate with the staff. The parties dispute whether plaintiff was able to effectively communicate with staff by writing notes. WCC points out that plaintiff was able to write a note to staff when she arrived asking for some pain medication. Plaintiff testified that she was not able to meaningfully communicate with WCC staff by using the pad and, she stated that it was "frustrating" and that she did not "understand what some of the medical terms were." Plaintiff also testified that although she wrote a note to a nurse

12

requesting pain medication on July 8, the nurse took the note and never came back to give her pain medication. Plaintiff further testified that she repeatedly requested pain medication but that she was not given medication until the evening of July 9 and the morning of July 10.

WCC's records indicate that on July 8, plaintiff wrote a note to a nurse stating, "Will you please bring me some pain medication." Plaintiff was then given pain medication throughout her stay at WCC as follows: two tabs of Percocet on July 8, 2014 at 7:00 p.m.; two tabs of Percocet on July 9, 2014 at 11:00 a.m.; two tabs of Percocet on July 9, 2014 at 2:00 p.m.; two tabs of Percocet on July 9, 2014 at 8:00 p.m.; and two tabs of Percocet on the morning of July 10, 2014.

WCC did not provide plaintiff with a sign language interpreter during the admission process on July 8. Nor did plaintiff request an interpreter at the time she was admitted at WCC.

On July 9, 2014, licensed Speech Language Pathologist, Candace Macintyre, evaluated plaintiff's communication needs and she noted: "[Patient] provided [with] a communication board. She is able to write her wants and needs, reads written communication, and lip read."

Subsequently on July 9, 2014, plaintiff requested an interpreter from WCC staff but she was told that she did not need one. Plaintiff's son also called WCC and left a voicemail message stating that his mother needed an interpreter and his request was noted in plaintiff's medical records. Plaintiff's record also indicated that a nurse advised plaintiff's son that a referral to

13

speech therapy was made to evaluate his mother's communication needs. However, there is no record that a speech therapist evaluated plaintiff's needs.

Plaintiff's physical therapy began at WCC as an in-patient on July 9, 2014. Both plaintiff and her son again requested an interpreter to assist during her July 9 physical therapy session but an interpreter was not provided. WCC's records indicate that plaintiff was able to understand and learn the physical therapy techniques taught to her through demonstration. Plaintiff's testimony contradicted WCC's records.

On July 10, 2014, plaintiff had two physical therapy sessions and WCC's records indicate that she understood and learned the physical therapy techniques taught to her through demonstration. Plaintiff's testimony contradicted WCC's records.

The evidence is disputed whether plaintiff needed an ASL interpreter to understand and receive the benefit of her physical therapy sessions at WCC.

In plaintiff's Activities Evaluation, the WCC staff noted that plaintiff "is deaf and does not read lips", and that she "was able to answer questions when [staff] wrote [them] down." Further, during her stay at WCC, WCC occasionally required plaintiff's consent and she had to sign or initial documents without the aid of an interpreter.

Plaintiff and her son advised WCC staff that she wanted to go home since she felt staff was ignoring her needs and since they would not provide her with an interpreter. Plaintiff also indicated that she wanted to go home

since she would be more comfortable there. WCC staff advised them that plaintiff could leave against medical advice.

Plaintiff was discharged from WCC on the evening of July 10, 2014, against medical advice. Plaintiff's discharge instructions were written on paper and no interpreter was provided.

During her two day stay at WCC, plaintiff did not have any surgeries or medical procedures. Rather, she received only rehabilitation care at WCC and her in-patient treatment was limited to the stated three physical therapy sessions.

During the relevant times, WCC had a policy titled Auxiliary Aids and Services for Persons with Disabilities. WCC's Auxiliary Aids and Services for Persons with Disabilities Policy states, in pertinent part, as follows:

> When an individual self-identifies as a person with a disability that affects the ability to communicate. . . or requests an auxiliary aid or service, staff will consult with the individual to determine what aids or services are necessary to provide effective communication in particular situations.... [f]or persons who are deaf/hard of hearing and who use sign language as their primary means of communication, the Director of Social Services or the Administrator at the Facility is responsible for providing effective interpretation or arranging for a qualified interpreter when needed.

WCC also had a written policy entitled "Sign Language Interpreters as of 8/2011" which provided that "family members or friends of the person will not be used as interpreters, unless specifically requested by the individual and after an offer of an interpreter at no charge to the person has been made by the facility. Such an offer and the response will be documented in the person's file…. If the family member or friend is not competent or appropriate

for any of these reasons, competent interpreter services will be provided."

Marlene Sebastianelli, WCC's Administrator, testified that WCC has an arrangement for interpreting services with East Stroudsburg University, in which a professor can be contacted to make arrangements to provide interpreting services to patients on an as-needed basis. Sebastianelli also stated that she did not have the occasion to use the sign language interpreter services through East Stroudsburg University during her 1-year tenure at WCC.

Sebastianelli also stated that in evaluating a deaf person's communication preferences, WCC staff should determine whether they feel they are "functioning well" in communicating with the deaf person. Further, Sebastianelli testified that WCC does not have a policy or procedure of providing an interpreter to evaluate a patient's communication preferences and whether they prefer to have a family member act as an interpreter.

Plaintiff testified that she was suing WCC because she "felt really ignored at Whitestone ... [she] felt that they weren't paying attention to [her] or providing any of [her] needs and ignoring [her] request for an interpreter."

Plaintiff testified that she will never return to WCC.

## II.    PROCEDURAL BACKGROUND

The plaintiff brought this suit on March 7, 2016, asserting federal claims under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131, *et seq*., and under Section 504 of the Rehabilitation Act of 1973

16

("RA"), [29 U.S.C. §794](). (Doc. 1). On July 5, 2016, plaintiff filed an amended complaint. (Doc. 23). Plaintiff asserts two claims against PMC and WCC alleging that they discriminated against her due to her hearing disability and alleging that they denied her meaningful access to their services by refusing to provide her with auxiliary aids, including an ASL interpreter, necessary to ensure effective communication with her about her treatment. Specifically, in Count I, plaintiff raises a claim under Title III of the ADA and, in Count II, she raises a claim under §504 of the RA.

Plaintiff essentially alleges that PMC and WCC violated the ADA and the RA by discriminating against her due to her hearing disability, namely, for failing to provide her with adequate auxiliary aids, including a live sign language interpreter, regarding her medical treatment at PMC in March 2014 and July 2014, and her physical therapy treatment at WCC in July 2014.

As relief, plaintiff seeks the court to issue a declaratory judgment finding that defendants' policies, procedures, and practices subjected her to "unlawful discrimination in violation of Title III of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act." Plaintiff also seeks an injunction "forbidding Defendants from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals meaningful access to and full and equal enjoyment of Defendants' facilities, services or programs." She further requests the court to issue an injunction ordering defendants to develop various policies prohibiting discrimination against deaf or hard of hearing individuals, to provide various services to ensure effective

17

communication with deaf or hard of hearing individuals, and requiring defendants to train all of their staff. Plaintiff also requests compensatory damages under §504 of the RA as well as attorney's fees and costs.

Following discovery, PMC filed a motion for summary judgment on September 10, 2018, pursuant to Fed.R.Civ.P. 56. (Doc. 51). On September 11, 2018, WCC filed a motion for summary judgment. (Doc. 55). The defendants' motions pertain to both of plaintiff's claims in her amended complaint. Plaintiff filed a cross-motion for summary judgment against PMC and WCC on October 2, 2018. (Doc. 64).

The motions have all been fully briefed and the parties filed their statements of material facts and responses to the opposing parties' statements. Additionally, the parties filed exhibits.

This court's jurisdiction over the plaintiff's federal claims is based on 28 U.S.C. §1331.

## III. DISCUSSION[2]

### A. Claims for Injunctive and Declaratory Relief Against PMC Under Title III of the ADA

The plaintiff is not entitled to monetary damages with respect to her claim under Title III of the ADA, since such relief is improper. "Under Title III

---

[2]Since the proper standard regarding a summary judgment motion under Fed. R. Civ. P. 56(c) is stated in the briefs of the parties, the court does not repeat it herein. *See also* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).

of the ADA, private plaintiffs may not obtain monetary damages and therefore only prospective injunctive relief is available." Anderson v. Macy's Inc., 943 F.Supp.2d 531, 538 (W.D.Pa. 2013) (citation omitted). Thus, plaintiff is permitted to request injunctive relief with respect to her Title III ADA claim against PMC. Anderson, 943 F.Supp.2d at 538.

PMC argues that plaintiff lacks standing to seek injunctive relief under the ADA since she has not sufficiently shown an intent to return to PMC and, if she does return, she has failed to show that she will be injured by not being provided effective communication in the future. Plaintiff argues that under the totality of the circumstances, she has established standing for injunctive relief based on the "intent to return" method as well as the deterrent effect doctrine, since she testified that "it's possible I'll go to PMC again if they provide an interpreter. I would go back there." She also points to the fact that during the relevant time of this case, she was brought to PMC on two occasions by ambulance showing that the hospital is near to her home and was utilized in the past for emergencies situations.

Under Title III of the ADA, discrimination is prohibited "against the disabled in the full and equal enjoyment of public accommodations." Spector v. Norwegian Cruise Line Ltd., 545 U.S. 119, 128, 125 S.Ct. 2169, 162 L.Ed.2d 97 (2005). "To state a claim of disability discrimination under Title III of the ADA, a plaintiff must show (1) discrimination on the basis of a disability; (2) in the full and equal enjoyment of goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation; (3) by

the public accommodation's owner, lessor or operator." Anderson v. Franklin Institute, 185 F.Supp.3d 628, 642 (E.D.Pa. 2016) (citations omitted). There is no dispute that PMC and WCC are places of public accommodation subject to Title III of the ADA. As such, entities that provide public accommodations, such as PMC and WCC, in part, must provide auxiliary aids and services to disabled individuals. Spector, 545 U.S. at 128 (citations omitted).

In order to have standing to bring a claim for injunctive relief under Title III of the ADA, plaintiff must show that she faces real and immediate threat of future injury. *See* Shaika v. Gnaden Huetten Memorial Hosp., 2015 WL 4092390 (M.D.Pa. July 7, 2015). "Standing is a threshold jurisdictional requirement, derived from the 'case or controversy' language of Article III of the Constitution." Id. at *4 (quoting Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 117 (3d Cir.1997). "Plaintiffs must have standing at all stages of the litigation, [ ], and they bear the burden of proving it 'with the manner and degree of evidence required at the successive stages of the litigation.' " Id. (citations omitted).

"Because the [only] remedy for a private ADA Title III violation is injunctive relief, courts look beyond the alleged past violation and consider the possibility of future violations."[3] Heinzl v. Starbucks Corp., 2015 WL 1021125, *5 (W.D.Pa. March 09, 2015). "Plaintiffs seeking prospective injunctive relief must demonstrate a 'real and immediate threat' of injury in order to satisfy the

---

[3]Attorneys' fees are also available to private plaintiffs under Title III of the ADA. Majocha v. Turner, 166 F.Supp.2d 316, 324 (W.D.Pa. 2001).

'injury in fact' requirement of standing. Id. (citing Anderson, 943 F.Supp.2d at 538)."[F]or purposes of establishing standing in an action for injunctive relief, 'a plaintiff must show that he or she is likely to suffer future injury from the defendant's illegal conduct.'" Hollinger v. Reading Health System, 2016 WL 3762987, *10 (E.D.Pa. July 14, 2016) (citation omitted). "Past illegal conduct is insufficient to warrant injunctive relief unless it is accompanied by 'continuing, present adverse effects.'" Doe v. Nat'l Bd. of Med. Examiners, 210 Fed.Appx. 157, 159-60 (3d Cir. 2006) (citations omitted); *see also* O'Shea v. Littleton, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

"In order to state a basis for a claim for injunctive relief, the complaint must allege that injury to plaintiff[] is 'certainly impending.'" Phillips v. St. Mary's Medical Center, 2013 WL 1124372, *2 (E.D.Pa. March 19, 2013) (citing Lujan, 504 U.S. at 564 n. 2). "A stated intent to return 'someday' to the source of the alleged injury is not sufficient." *Id.* (citing Lujan, 504 U.S. at 564 n. 2). Thus, the injury must be personal, actual and imminent, and cannot be speculative. Doe, 199 F.3d at 153.

"[The plaintiff] must demonstrate a 'real and immediate threat' of injury in order to satisfy the 'injury in fact requirement.'" Hollinger, 2016 WL 3762987, *10. "A plaintiff seeking to meet his burden of showing a sufficient imminent injury in a Title III ADA case may use one of two methods: the intent to return method or the deterrent effect doctrine." Id. (citation omitted).

The plaintiff argues, in part, that she had a history of using PMC's services and that this shows it is possible she will require them in the future,

particularly if PMC provides an interpreter. She states that it is also possible she may have to utilize PMC in the future for emergencies as she did in the past. The plaintiff relies upon both the intent to return method and the deterrent effect doctrine.

As the court in Hollinger, 2016 WL 3762987, *10-*11, stated:

The intent to return method requires a plaintiff to show that:

(1) the plaintiff has alleged that the defendant engaged in past discriminatory conduct that violates the ADA; (2) it is reasonable to infer from allegations in the complaint that the discriminatory conduct will continue, and (3) it is reasonable to infer based on past patronage, proximity of the public accommodation to the plaintiff's home, business, or personal connections to the area, that the plaintiff intends to return to the public accommodation in the future.

(citations omitted).

"Under the deterrent effect doctrine, a plaintiff has suffered an actual and imminent injury sufficient to confer standing where the plaintiff was "deterred from patronizing a public accommodation because of a defendant's failure to comply with the ADA." Id. at *11 (citation omitted). "A plaintiff seeking to satisfy the deterrent effect doctrine 'must show that he or she has actual knowledge of barriers preventing equal access and a reasonable likelihood that the plaintiff would use the facility if not for the barriers.'" Id. (citation omitted). Further, "[e]ven under the deterrent effect test, a plaintiff must still show that he or she has an intent to return to the place of alleged discrimination." Hollinger, 2017 WL429804 (E.D.Pa. Jan. 31, 2017). *See also* Anderson, 185 F.Supp.3d at 640 ("To satisfy [the deterrent effect] test, a

plaintiff must show that he or she has actual knowledge of barriers preventing equal access and a reasonable likelihood that the plaintiff would use the facility if not for the barriers.") (citation omitted).

In *Shaika*, the plaintiff sought injunctive and declaratory relief under Title III of the ADA against the defendant hospital alleging that during her past visits to the hospital no sign language interpreter or assistive device, such as a VRI machine, was available for her use. In *Shaika*, 2015 WL 4092390, at *7, this court dismissed plaintiff's stated claims explaining that:

> "[T]he plaintiff must put forth a definitive, uncontested intent to return before filing the complaint to establish standing." Anderson, 943 F.Supp.2d at 540 (citation omitted). "A plaintiff's intention to return to defendant's place of public accommodation 'some day' ... without any description of concrete plans, or indeed even any specification of when the some day will be - do not support a finding of the requisite actual or imminent injury." Id. (citing Lujan, 504 U.S. at 564). The plaintiff fails to allege in her affidavit that she has a definitive appointment or plan to return to [defendant hospital] for any treatment or test. Thus, the plaintiff fails to establish that she has a plan to return to [defendant hospital]. *See* Anderson, 943 F.Supp.2d at 540-41.

This court concluded that "[s]tanding will not exist for injunctive relief and declaratory relief if 'adjudication ... rests upon contingent future events that may not occur as anticipated or indeed may not occur at all.'" Id. at *8 (citation omitted).

Similarly, in the *Hollinger* case, the court dismissed plaintiff's Title III ADA claim for lack of standing. Plaintiff argues that *Hollinger* is distinguishable from her case, especially since she alleges ADA violations regarding her medical care at PMC for two injuries. Plaintiff contends she

presented sufficient facts to show that she may likely require future treatment at PMC, and that PMC will likely discriminate against her in the future because of her disability. Further, plaintiff argues that she has presented "facts which establish a reasonable likelihood that [she] would patronize [PMC] if not for the barriers preventing equal access." Hollinger at *11. Plaintiff merely testified that it is possible she would return to PMC if an interpreter was provided. Her speculative testimony is not sufficient to establish standing. *See Shaika, supra.*

The court finds that the plaintiff has not sufficiently demonstrated a likelihood of a future injury to establish that she has standing to seek injunctive relief. The three requirements for standing are "necessary elements of a plaintiff's case" and mere allegations are insufficient since they are not pleading requirements. Doe, 199 F.3d at 152. "The proper analysis of standing focuses on whether the plaintiff suffered an actual injury, not on whether a statue was violated." Id. at 153.

The plaintiff's testimony, discussed above, has failed to establish more than a mere possibility that she will likely be discriminated against by PMC regarding her hearing disability and she has failed to show that this discrimination is actual and imminent. Plaintiff presented no evidence to show that she has a definitive appointment or plan to return to PMC for any treatment or test. Further, it is undisputed that prior to plaintiff's March 2014 surgery, PMC did provide a live interpreter and plaintiff was satisfied. PMC provided plaintiff with a VRI machine for her July 2014 surgery but there were

issues with the Wi-Fi connection. As PMC points out, there is no evidence that the Wi-Fi issues with its VRI machine were permanent or that they continued to the present time.

Additionally, after 2014, PMC has added additional computers to provide better access to VRI services at its hospital. As this court stated in Shaika, 2015 WL 4092390, *7, "[t]he corrective measure taken by the defendants in the instant case shows that they are responsive to their obligations under the ADA and that there is not a substantial likelihood that the defendants will violate the plaintiff's rights under the ADA again." Thus, plaintiff has not shown that "she will be injured by not having effective communication [at PMC] in the future" as required. Id.

Moreover, PMC points out that plaintiff has not returned to its hospital at any time since July of 2014, and she did not testify that she had any definite plan to return to PMC.

As such, plaintiff's requests for prospective injunctive relief against PMC fail since she has not made "a sufficient showing that [she] is likely to suffer a future injury from [PMC's] allegedly discriminatory conduct." Hollinger, 2016 WL 3762987, *11. Plaintiff has failed to meet her burden of establishing her standing regarding her stated ADA claim. *See* Phillips v. St. Mary's Medical Center, 2013 WL 1124372, *3 ("The imminency requirement is applicable in Title III [ADA] cases.") (citing Doe, 199 F.3d at 153).

Based on the same reasoning regarding plaintiff's claim for injunctive relief, the court will also grant PMC summary judgment with respect to

25

plaintiff's request for declaratory relief under Title III of the ADA, i.e., she has failed to show that she has standing for such relief. *See* Shaika, 2015 WL 4092390, at *8. Further, since plaintiff lacks standing with respect to her claims for injunctive and declaratory relief under Title III of the ADA, plaintiff's motion for summary judgment on these claims against PMC will be denied.

Thus, PMC's motion for summary judgment with respect to plaintiff's claim under Title III of the ADA will be granted. Plaintiff's motion for summary judgment with respect to her claim under Title III of the ADA against PMC will be denied.

### B. Claims for Injunctive and Declaratory Relief Against WCC Under the ADA

Plaintiff has conceded her lack of standing with respect to her claim for injunctive relief under Title III of the ADA as against WCC and she voluntarily dismisses this claim against WCC. (Doc. 67 at 6 n. 1). Further, plaintiff has not addressed WCC's argument that she also lacks standing with respect to her claim for declaratory relief under Title III of the ADA against it. As such, WCC is entitled to judgment with respect to plaintiff's claims for injunctive and declaratory relief under Title III of the ADA. *See* Blakeney v. Marsico, 340 Fed.Appx. 778, 780 (3d Cir. 2009) (Third Circuit stated that "[t]o satisfy the standing and 'case or controversy' requirements of Article III, a party seeking a declaratory judgment 'must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future.'" The Court also held that past exposure to alleged violations of federal law is not sufficient for

a party seeking a declaratory judgment.) Id. (citations omitted).

Thus, WCC's motion for summary judgment with respect to plaintiff's claim against it under Title III of the ADA will be granted.

### C. **Claims for Injunctive and Declaratory Relief Against PMC and WCC Under the RA**

Plaintiff also seeks declaratory and injunctive relief against PMC and WCC under §504 of the RA. As WCC states, plaintiff does not address its argument that she lacks standing for declaratory and injunctive relief against it under §504 of the RA.

As this court held in *Shaika*, plaintiff's lack of standing to pursue claims for injunctive and declaratory relief under Title III of the ADA is equally fatal to her parallel or alternative claims under the RA also seeking injunctive and declaratory relief. Shaika, 2015 WL 4092390, at *8 ("[T]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same.") In Shaika, 2015 WL 4092390, at *8, this court stated that "insofar as the plaintiff seeks injunctive relief and declaratory relief regarding her RA claim, these requests for relief will also be dismissed with prejudice for the same reasons that this relief will be dismissed regarding her ADA claim, i.e., for lack of standing." "Standing will not exist for injunctive relief and declaratory relief if "adjudication ... rests upon 'contingent future events that may not occur as anticipated or indeed may not occur at all.'" Id. (citing Pryor v. National Collegiate Athletic Ass'n, 288 F.3d 548, 561 (3d Cir. 2002)).

Thus, PMC's and WCC's motions for summary judgment with respect

to plaintiff's claims for injunctive and declaratory relief against them under the RA will be granted.

### D. **Claim for Damages Against PMC and WCC Under Section 504 of the RA**

Remaining is plaintiff's claim for damages against both PMC and WCC under §504 of the RA. The parties dispute whether the plaintiff has presented sufficient evidence to show that she is entitled to money damages with respect to her RA claim.

"The Rehabilitation Act of 1973 'was the first broad federal statute aimed at eradicating discrimination against individuals with disabilities.'" Berardelli v. Allied Services Institute of Rehabilitation Medicine, 900 F.3d 104, 114 (3d Cir. 2018) (citation omitted).

Section 504 of the RA, 29 U.S.C. §794(a), states, in relevant part:

No otherwise qualified individual with a disability in the United States, ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

Under the RA, "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers", and federally funded programs have a requirement to provide "reasonable modifications to accommodate the disabled" or a "duty to accommodate." Berardelli, 900 F.3d at 115. Thus, the RA prohibits discrimination on the basis of disability in federally funded programs. Blunt v. Lower Merion School Dist., 767 F.3d 247, 274-75 (3d Cir. 2014). The RA "bars both federal agencies and

28

private entities that receive federal funding from discriminating on the basis of disability and is not limited to the employment context." *Freed v. Consol. Rail Corp.*, 201 F.3d 188, 191 (3d Cir. 2000).

"To state a claim under §504, a plaintiff must demonstrate that: (1) she is a qualified individual with a disability; (2) she was denied the benefits of a program or activity of a public entity which receives federal funds; and (3) she was discriminated against based on her disability." *Reed v. Schuylkill Health System*, 2013 WL 647912729, *3 (M.D.Pa. Dec. 9, 2013) (citation omitted). *See also* Hollinger, 2017 WL 429804, *9 ("To make out a prima facie case under the RA, a plaintiff must show: (1) he or she is handicapped or disabled as defined under the statute; (2) he or she is otherwise qualified to participate in the program at issue; and (3) he or she was precluded from participating in a program or receiving a service or benefit because of his or her disability.") (citing *CG v. Pa. Dep't Educ.*, 734 F.3d 229, 235 (3d Cir. 2013)). Further, "courts consistently hold that §504 of the RA cannot be construed to provide a cause of action for medical treatment decisions." *Hollinger*, 2017 WL 429804, *9 (citations omitted). Thus, the RA does not provide a remedy for alleged medical negligence. *See* Rosario v. Washington Memorial Hospital, 2013 WL 2158584, *5 (E.D.Pa. 2013) (court held that the RA "afford[s] disabled persons legal rights regarding access to programs and activities enjoyed by all, not a general federal cause of action for challenging the medical treatment of their underlying disabilities.").

In *Reed*, 2013 WL 647912729, *3, the court explained the applicable

RA's regulations as follows:

> The RA's implementing regulations mandate that a hospital that receives federal funds "shall establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care." 45 C.F.R. §84.52(c). Furthermore, a recipient hospital with fifteen or more employees "shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question ." Id. at §84.52(d)(1). "[A]uxiliary aids may include brailled and taped material, interpreters, and other aids for persons with impaired hearing or vision." Id. at §84.52(d)(3). "[A]ids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." Id. at §84.4(b)(2).

Here, the first two elements of plaintiff's claim under §504 of the RA against PMC and WCC are not disputed. Rather, the parties dispute whether PMC and WCC failed to provide plaintiff meaningful access to their medical services by failing to ensure they had effective communication with her during her treatment at their facilities. The parties also dispute whether the auxiliary aids and services PMC and WCC provided to plaintiff gave her an equal opportunity and meaningful access to the benefits of their treatment. *See* Hollinger, 2017 WL 429804, *10 ("to make out a prima facie claim for disparate impact under the RA, the plaintiff must show that he or she 'has been deprived of meaningful access to a benefit to which he or she was entitled.'") (citing CG v. Pa. Dept. Educ., 734 F.3d 229, 237 (3d Cir. 2013)).

The evidence is disputed as to whether plaintiff was denied meaningful

access to treatment at PMC and WCC. The parties selectively point to different portions of plaintiff's treatment to argue their positions, but viewed in totality, the evidence is disputed as to whether plaintiff was provided with effective communication during all phases of her treatment at both facilities. No doubt that PMC and WCC tried to communicate with plaintiff about her treatment, but plaintiff and her witnesses testified that there were times that she was not able to effectively receive information and to understand details of her treatment. Plaintiff's evidence also shows that plaintiff and her son repeatedly requested auxiliary aid in the nature of a live interpreter to ensure effective communication with her at both PMC and WCC, and indicated that the methods being provided were not always effective for her since she was having trouble understanding, thus preventing her for meaningful participation in her treatment. Plaintiff presented evidence that at times she needed an interpreter to communicate effectively during her treatment at PMC and WCC, and that the auxiliary services they provided were not always effective, particularly regarding consent and discharge instructions. Also, there is no dispute that there were glitches with the VRI machine at PMC at times which plaintiff and her witnesses testified caused a communication breakdown. It is also disputed whether the written communication with plaintiff was effective since the extent of plaintiff's understanding of English and understanding through reading and writing is disputed, especially regarding medical terminology and more complicated information like procedures, medications and associated risks. Plaintiff's evidence also shows that she mainly

communicates in ASL. In fact, plaintiff testified despite the means used to try and communicate with her at PMC and WCC, including using her son as interpreter, she did not understand a lot of what they were trying to tell her about her condition and treatment at the relevant time. Plaintiff also presented evidence that neither PMC nor WCC assessed in a meaningfully way her communication needs and abilities at the time of her treatment. On the other hand, PMC and WCC presented evidence that the auxiliary aids and services provided to plaintiff during her treatment at their facilities was sufficient to conduct communication with her about relevant medical information and, that she was able to understand her treatment and therapies, and to ask questions in a meaningful way. However, as plaintiff points out, the subjective beliefs of the staff at PMC and WCC noted in their medical records that plaintiff understood what she was being told about her treatment through auxiliary aids are not determinative as to whether she truly understood.

As such, the evidence is disputed as to whether the actions of PMC and WCC denied plaintiff meaningful access to their medical services or excluded her from their services. The jury must decide if PMC and WCC provided plaintiff with proper auxiliary aids to ensure she received the same access and benefit from treatment as hearing patients. Also, as discussed below, the jury must decide whether the actions of PMC and WCC amounted to deliberate indifference allowing plaintiff to recover damages under the RA.

The plaintiff also presented sufficient evidence to argue that a live interpreter was a necessary accommodation at both facilities; that she did not

understand without an interpreter the full scope of medical issues and treatments involved; and, that without an interpreter she was denied equal access to the full benefits of the treatment that similarly situated hearing patients received. Thus, under the facts and circumstances of this case, the jury must decide if a live interpreter was a necessary accommodation to enable plaintiff to effectively communicate with staff at PMC and WCC and, to enable her to understand what they were telling her about her condition and treatment.

Moreover, even though plaintiff's son Joseph, and her friend Antal were asked to interpret for plaintiff, which they reluctantly did on occasion, reliance on Joseph and Antal was not a proper substitute for an appropriate auxiliary aid. In fact, plaintiff stated that she did not want her son and friends to interpret for her, and they stated that they did not want to interpret for her, especially since they were not disinterested observers with respect to her care.

Simply stated, the evidence is disputed as to whether the communication with plaintiff about her condition and treatment at PMC and WCC was sufficient to ensure that she was afforded the same level of communication about her medically relevant information that was provided to hearing patients. Thus, plaintiff's claim under §504 of the RA as against PMC and WCC shall proceed.

The court also finds that plaintiff can proceed with her claim for money damages against PMC and WCC under the RA. The Third Circuit has held

that the available remedies for a violation of §504 of the Rehabilitation Act "include compensatory damages, injunctive relief, and other forms of relief traditionally available under suits for breach of contract." A.W. v. Jersey City Pub. Sch., 486 F.3d 791, 804 (3d Cir. 2007); *see also* Majocha v. Turner, 166 F.Supp.2d 316 (W.D.Pa. 2001).

In this case, the plaintiff seeks compensatory damages on her claim against PMC and WCC under §504 of the RA. She alleges that PMC's and WCC's failure to provide her with auxiliary aids and services and failure to assess her needs necessary to allow her to effectively communicate with their respective staff about her medical condition and treatment amounts to deliberate indifference.

To obtain compensatory monetary damages under §504 of the RA, the Third Circuit requires a plaintiff to prove intentional discrimination. S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 261 (3d Cir. 2013). Here, there does not appear to be evidence of intentional discrimination by either PMC or WCC. However, the Third Circuit has also held that "a showing of deliberate indifference may satisfy a claim for compensatory damages under §504 of the RA [and the ADA]." S.H., 729 F.3d at 263; D.E.v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 269 (3d Cir. 2014).*See also* Reed, 2013 WL 647912729, *3 ("Intentional discrimination required to obtain damages under §504 of the RA], however, can be proved by a showing of deliberate indifference.") (citation omitted). The Third Circuit Court in D.E., 765 F.3d at 269, stated:

To satisfy the deliberate indifference standard, a plaintiff "must present evidence that shows both: (1) knowledge that a federally protected right is substantially likely to be violated ..., and (2) failure to act despite that knowledge." Id. at 265 (citing Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001). "Deliberate indifference does not require a showing of personal ill will or animosity toward the disabled person." Id. at 263 (quoting Meagley v. City of Little Rock, 639 F.3d 384, 389 (8th Cir. 2011) (internal quotation marks omitted)). It does, however, require a "'deliberate choice, rather than negligence or bureaucratic inaction.'" Id. (quoting Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 276 (2d Cir. 2009)).

Based on the evidence and discussion detailed above, the court finds disputed material facts as to whether PMC's and WCC's actions rise to the level of deliberate indifference with respect to plaintiff's RA claim for damages. The defendants presented evidence to show that they provided plaintiff with auxiliary aids and services to address her communication needs and to discuss her condition and the treatment they were providing her. The defendants also indicate that plaintiff's son Joseph and her friend Antal were used at times to effectively communicate with plaintiff. However, as explained, plaintiff's evidence paints a different picture of her care at PMC and WCC, and shows that there were several times when she found their attempts to communicate with her not effective, such as when the VRI machine at PMC was malfunctioning and when WCC tried to show plaintiff her therapy through demonstration. Plaintiff testified that when she did not fully understand what the staff were trying to tell her, she requested live interpreters. Plaintiff presented evidence, which is disputed, that defendants failed to adhere to their own polices and to provide her with appropriate auxiliary aids. Plaintiff

35

also presented evidence that neither defendant adequately assessed her communication needs regarding the medical care they provided to her and that if they did, they would have provided her with a live interpreter as she and her son repeatedly requested. Indeed, plaintiff was so frustrated at WCC and felt ignored by staff without having the assistance of an interpreter, she voluntarily discharged against medical advice after only a short in-patient stay. Further, WCC was well aware that plaintiff and Joseph did not consent to having her son interpret for her, and that plaintiff made repeated requests for a live interpreter regarding her therapy prior to her discharge.

Additionally, the plaintiff, as did the plaintiff in Reed, 2013 WL 6479127, *4, "cites to a case where a hearing-impaired plaintiff proceeded on a RA claim when a hospital failed to provide an interpreter and communication occurred with the plaintiff primarily through his family members acting as interpreters." (citing Loeffler v. Staten Univ. Island Hosp., 582 F.3d 268, 274-77 (2d Cir. 2009) (Second Circuit vacated "district court's order granting summary judgment on RA claim where hearingimpaired patient's children were required to interpret for their father during his time in the hospital before and after heart surgery")). In Reed, 2013 WL 6479127, *5, the court considered whether plaintiff's complaint pled sufficient facts that defendant health care provider acted with deliberate indifference to her hearing disability where plaintiff alleged that she requested an interpreter during the course of her medical treatment. The plaintiff in *Reed* also pled that based on defendant's refusal to provide an interpreter, she "was unable to understand

and participate in her care." The court in *Reed, id.*, stated that "persuasive authority supports the proposition that the failure of a hospital and its medical personnel to respond to requests for a sign-language interpreter may state a claim under the RA", and that "the test of determining whether an entity subject to the RA has provided appropriate auxiliary aids where necessary is inherently fact-intensive." (quoting Liese, 701 F.3d at 342-43 (citing Chisolm v. McManimon, 275 F.3d 315, 327 (3d Cir. 2001)("Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment.")). *See also* Randolph v. Rodgers, 170 F.3d 850, 859 (8th Cir. 1999) (Eight Circuit held that the issue of whether a sign language interpreter was required under the RA is a question of fact which was not appropriate for summary judgment).

No doubt that the Eleventh Circuit in Liese, 701 F.3d at 343, recognized that the "simple failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights under the RA", and that "the proper inquiry is whether the auxiliary aid that a hospital provided to its hearing-impaired patient gave that patient an equal opportunity to benefit from the hospital's treatment." The facts in this case are disputed regarding whether the auxiliary aids that PMC and WCC provided to plaintiff afforded her with the same chance to benefit from their treatment as their non-hearing impaired patients. Thus, questions of fact remain that are appropriate for a jury to decide.

As such, in viewing the evidence in a light most favorable to all parties,

the motions for summary judgment of PMC, WCC and plaintiff with respect to plaintiff's claim under §504 of the RA for damages will be denied. Plaintiff will be permitted to proceed to trial regarding her claim for compensatory damages under §504 of the RA against PMC and WCC.

## IV. CONCLUSION

For the foregoing reasons, the motions for summary judgment of PMC, (Doc. 51), and of WCC, (Doc. 55), will be **GRANTED IN PART AND DENIED IN PART**. The motions for summary judgment of PMC and WCC will be **GRANTED** with respect to plaintiff's claim under Title III of the ADA, Count I of plaintiff's amended complaint, (Doc. 23). The motions for summary judgment of PMC and WCC will be **DENIED** with respect to plaintiff's disability discrimination claim for damages under Section 504 of the Rehabilitation Act, Count II of her amended complaint. The plaintiff's cross-motion for summary judgment, (Doc. 64), will be **DENIED IN ITS ENTIRETY**. Specifically, the plaintiff's motion will be **DENIED** with respect to her claim against PMC under Title III of the ADA. The plaintiff's motion will also be **DENIED** with respect to her claim for damages under Section 504 of the Rehabilitation Act against PMC and WCC.

Finally, the plaintiff's claim for compensatory damages under §504 of the RA against PMC and WCC will **PROCEED TO TRIAL**. A separate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: January 16, 2019**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2016 MEMORANDA\16-0402-01.wpd