**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSLYVANIA**
--------------------------------------------------------------

| | |
|---|---|
| SVETLANA GITERMAN, | **ELECTRONICALLY FILED** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | **NO. 3:16-CV-00402-MEM** |
| POCONO MEDICAL CENTER, POCONO HEALTH SYSTEM and WHITESTONE HEALTHCARE GROUP LLC d/b/a WHITESTONE CARE CENTER, | **JUDGE: MANNION** |
| Defendants. | |

---

## PLAINTIFF'S PRE-TRIAL MEMORANDUM

**Date conference was held by counsel:** March 8, 2019

A. **Brief statement as to federal court jurisdiction**

The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1343 for Plaintiff's claims arising under the Rehabilitation Act of 1973.

("RA").Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because

one or more defendants resides in this District, all defendants reside in the

Commonwealth of Pennsylvania, and the events or omissions giving rise to the claims at issue occurred in this District.

B.    **Summary statement of facts and contentions as to liability:**

Plaintiff Svetlana Giterman, a profoundly deaf individual, brings this action against Defendant Pocono Medical Center, Pocono Health System ("PMC") and Defendant Whitestone Care Center ("WCC"), alleging violations of Section 504 of Rehabilitation Act, 29 U.S.C. § 794 ("RA").[1] Plaintiff Svetlana Giterman is a profoundly deaf individual. Like many other individuals who have been deaf since infancy, she has a limited grasp of the English language, and instead communicates primarily in American Sign Language ("ASL"). While communicating in English is difficult for Ms. Giterman, she is fluent in ASL. Plaintiff's expert Dr. Judy Shepard Kegl, assessed that Plaintiff's lipreading ability is poor and that under optimal conditions, she can lipread around 33% of the words that are said. Dr. Kegl further assessed that Plaintiff reads English at a second-grade level.

**Pocono Medical Center**

On March 8, 2014, Ms. Giterman sought treatment at Defendant Pocono Medical Center ("PMC") for a broken ankle. During this visit to PMC, PMC staff failed to heed to Ms. Giterman's repeated requests for an interpreter. PMC also ignored the requests for an interpreter made on Ms. Giterman's behalf by her son

---

[1] Plaintiff notes that pursuant to this Court's Order (ECF 89), Plaintiff's claims under Title III of the Americans with Disabilities Act have been dismissed for lack of standing.

Joseph Giterman and her deaf friend Sharon Antal. Instead, PMC staff attempted to communicate with Ms. Giterman through a malfunctioning Video Remote Interpreting system ("VRI"), written English, and against Ms. Giterman's wishes, relied upon her son, Joseph Giterman to interpret during parts of her stay.

On July 3, 2014, Ms. Giterman again sought treatment at the Emergency Room at PMC after being involved in car accident in which she sustained a fracture injury to the same ankle that she received treatment on in March of 2014, and to her ribs. During that visit, Ms. Giterman was admitted to PMC and underwent surgery on her ankle. Throughout her July 3, 2014 to July 8, 2014 stay, PMC, again, denied her and her companions' repeated requests for interpreters. At one point during her stay, PMC staff offered Ms. Giterman the VRI, but the VRI would not connect to an interpreter due to apparent Wi-Fi connectivity issues. PMC's doctors, including her treating surgeon Dr. Stefan Sinco, and other staff attempted to rely on Joseph Giterman and Sharon Antal—against they and Ms. Giterman's express wishes—to explain key aspects of her care to her, including a pre-operative surgery plan, informed consent forms, and post-operative care instructions. PMC's staff also relied upon rudimentary drawings and written notes to attempt to communicate critical medical information with Ms. Giterman. On July 8, 2014, Ms. Giterman was discharged from PMC, without an interpreter present to explain her discharge instructions to her.

While PMC had a written policy to provide interpreting services upon a patient's request, and for certain medical interactions, Defendant's staff members failed to act in accordance with this policy throughout Ms. Giterman's hospital stays. Additionally, PMC's staff lacked adequate training on PMC's policies pertaining to the use of family members or friends as interpreters, as well as alternative measures to be taken in the event of VRI malfunction. Overall, PMC's actions and inactions throughout Ms. Giterman's hospital stay in failing to assess Ms. Giterman's communication needs, failing to ensure effective communication with Plaintiff during key medical interactions, and failing to implement and/or follow its own policies to provide necessary auxiliary aids and services, amount to deliberate indifference under the RA.

**<u>Whitestone Care Center</u>**

On July 8, 2014, Ms. Giterman was transferred to Defendant Whitestone Care Center ("WCC") for rehabilitative care, where she stayed until she was discharged against medical advice on July 10, 2014. During her stay at WCC, WCC staff failed to conduct a proper assessment of Ms. Giterman's communication needs. While WCC claims that a Speech Therapist conducted an assessment, the record is unclear whether an assessment was ever conducted or how a Speech Therapist conducted a communication assessment of a profoundly deaf patient that does not speak, without an interpreter present. WCC staff forced

Ms. Giterman to rely upon written notes, gesturing, and lipreading to communicate. Ms. Giterman felt that communication with staff was ineffective as she was unable to understand written medical terms or to adequately express her need for pain medication and have her requests addressed by staff, leaving her feeling ignored. WCC also ignored Ms. Giterman and her son's repeated requests for interpreters. Ms. Giterman became so frustrated with the lack of effective communication at WCC that she discharged herself against medical advice on July 10, 2014. No interpreter was provided at her discharge meeting to explain the consequences of her discharge, or the instructions to her.

The record further reveals that WCC's policies pertaining to the provision of interpreters is severely deficient: WCC does not have a formal contract for interpreting services, but rather, an "arrangement" with East Stroudsburg University to provide ASL interpreting services. WCC staff are not trained on how to obtain an ASL interpreter through this arrangement or any other arrangement. While WCC has a *written* policy prohibiting the use of family members as interpreters absent specific consent from the resident, WCC staff lacks training on this policy.

Plaintiff contends that WCC's staff members' failure to assess Ms. Giterman's communication needs, to heed to the Giterman's multiple requests for an interpreter, or to implement adequate policies and staff training to ensure effective

communication for deaf and hard of hearing patients amounts to deliberate indifference under the RA.

**B. Comprehensive Statement of Undisputed Facts as agreed to by counsel at the conference of attorneys required by Local Rule 16.3. No facts should be denied unless opposing counsel expects to present contrary evidence or genuinely challenges the fact on credibility grounds. The parties must reach agreement on uncontested facts even though relevancy is disputed.**

*Background*

1. Plaintiff is deaf.

2. Plaintiff is a "qualified individual with a disability" within the meaning of Section 504 of the Rehabilitation Act.

3. Plaintiff Svetlana Giterman became deaf at 9 months of age when she developed an ear infection.

4. As a result, there is no dispute that plaintiff has a hearing disability for which she is entitled to protection from discrimination under federal laws, including the Section 504 of the Rehabilitation Act of 1973.

5. Ms. Giterman moved to the United States from the Ukraine at age 19.

6. Joseph Giterman is Svetlana Giterman's only son.

7. Sharon Antal is Ms. Giterman's friend. She was born deaf and her primary and preferred language is American Sign Language.

8. Ms. Giterman communicates primarily in American Sign Language ("ASL"), which is her primary and preferred method of communication.

*Pocono Medical Center – March 8, 2014*

9. Defendant Pocono Medical Center is a recipient of federal financial assistance.

10. On March 8, 2014, Plaintiff fractured her right ankle while exercising at home.

11. Plaintiff was transported by ambulance to the PMC's Emergency Department on March 8, 2014.

12. On that day, Joseph Giterman accompanied his mother to PMC.

13. During Plaintiff's March 8, 2014 visit to PMC, Plaintiff's son Joseph Giterman, alerted PMC staff to Ms. Giterman's deafness.

14. On March 8, 2014, Joseph Giterman notified Sharon Ms. Antal via a text message that Ms. Giterman was in the hospital. Ms. Antal went to PMC to visit Ms. Giterman after receiving the text message.

15. Plaintiff was provided a Deaf Talk Video Remote Interpreting ("VRI") services computer.[2]

---

[2] Plaintiff does not dispute that the VRI was provided, but objects to extent that the VRI failed to function properly or to ensure effective communication.

16. PMC Staff did not utilize a live interpreter nor VRI to provide discharge instructions to Ms. Giterman on March 8, 2014.

17. A nurse printed out a paper with the discharge instructions and provided it to plaintiff along with a discharge form. PMC staff then relied upon plaintiff's son, Joseph Giterman, to help interpret the discharge instructions and form.[3]

*Pocono Medical Center* – July 3, 2014 to July 8, 2014

18. On July 3, 2014, Ms. Giterman was involved in a car accident that caused injury to the same ankle that she had broken in March of 2014, and to her ribs.

19. Ms. Giterman was taken to the Emergency Room at PMC by ambulance.

20. Plaintiff was at Pocono Medical Center from July 3, 2014 to July 8, 2014.

21. During Ms. Giterman's July 3, 2014 visit, PMC's staff knew that Plaintiff was deaf upon admission.

---

[3] Plaintiff does not dispute this fact, but objects to the extent that she did consent to Mr. Giterman being used as an interpreter.

22. On July 3, 2014, a nurse wrote a note to Ms. Giterman indicating that her ankle was broken again. No interpreter was provided for Ms. Giterman upon her arrival.

23. On July 3, 2014, Plaintiff says she was offered VRI, but claims a problem occurred with the Wi-Fi connection.

24. On July 3, 2014, Joseph Giterman arrived at the hospital after his mother and observed there was no interpreter present and that the VRI was not actively working when he arrived.

25. On July 3, 2014, Dr. Stefan Sinco, the attending surgeon, provided Ms. Giterman with a surgery plan, which Joseph Giterman explained to her.

26. Plaintiff had surgery on her ankle on July 4, 2014.

27. Elizabeth Felletter is a case manager with discharge planning responsibilities at Lehigh Valley Pocono.

28. A July 7, 2014 note in Ms. Giterman's medical records indicate that Ms. Felletter "was unable to hold an interview with PT, patient, since the patient was deaf."

29. Ms. Giterman's medical records indicate that Ms. Felletter called Joseph Giterman to conduct a discharge assessment of Ms. Giterman.

30. Ms. Felletter did not use an interpreter for the discharge planning meeting.

31. PMC Staff did not utilize a live interpreter nor VRI to provide discharge instructions to Ms. Giterman on July 8, 2014.

32. Michael Hennigan is a Registered Nurse at Lehigh Valley Health Network.

33. Ms. Giterman's medical records signed by Michael Hennigan indicate: "son at bedside translating."

34. Mary Jackson is the Director of Care Coordination at Lehigh Valley Pocono Medical Center.

35. Since 2013, PMC has had a contract with the Center for Independent Living, to provide live interpreting services.

36. Defendant PMC does not provide forms for deaf and hard of hearing patients or companions to request and/or decline auxiliary aids and services. (PMC Response to Request for Admission No. 11).

37. Defendant PMC does not provide forms for deaf and hard of hearing patients or companions to request and/or decline auxiliary aids and services. (PMC Response to Request for Admission No. 11).

38. Providing interpreters to Plaintiff during her March and July 2014 visits to PMC would not have constituted an undue burden to PMC. (PMC Response to Request for Admission No. 13)

*Whitestone Care Center*

39. Defendant Whitestone Care Center is a recipient of federal financial assistance.

40. On July 8, 2014, Plaintiff was transferred from Pocono Medical Center to Whitestone Care Center for physical therapy.

41. Defendant Whitestone Care Center's staff were made aware that Plaintiff was deaf upon Plaintiff's admission.

42. Plaintiff was provided with a pad and pen during her treatment at WCC.

43. Plaintiff was provided with a communication board during her treatment at WCC.

44. On July 9, 2014, Plaintiff began participating in physical therapy sessions at WCC.

45. When not participating in physical therapy sessions on July 10, 2015, Plaintiff spent the rest of the time in her room.

46. Plaintiff did not undergo any medical procedures or surgeries at WCC.

47. Plaintiff left WCC at approximately 5:00 p.m. on July 10, 2014.

48. Marlene Sebastianelli testified she was an Administrator of Saber Healthcare, Whitestone Care Center in 2016 and 2017.

49. During the relevant timeframe, Whitestone Care Center had an
    arrangement for interpreting services with East Stroudsburg
    University, in which a professor, Thomas Bartek, could be contacted to
    make arrangements to provide interpreting services to residents on an
    as-needed basis.

50. Between her 2016 hire and 2017, Ms. Sebastianelli has never advised
    WCC staff that they should get a sign language interpreter for a
    resident.[4]

51. Ms. Sebastianelli testified that speech therapy is not used to
    rehabilitate people who have been deaf their whole lives.

52. WCC's written policy entitled "Sign Language Interpreters as of
    8/2011" states that "family members of friends of the person will not
    be used as interpreters, unless specifically requested by the individual
    and after an offer of an interpreter at no charge to the person has been
    made by the facility. Such an offer and the response will be
    documented in the person's file…. If the family member or friend is
    not competent or appropriate for any of these reasons, competent
    interpreter services will be provided."

---

[4] Defendant WCC does not dispute this fact, but notes that Ms. Sebatianelli was hired by WCC in 2016, when a new
process was instituted for interpreting services.

53. Ms. Giterman's case was the only time Ms. Sebastianelli was aware that WCC had used a family member to interpret a discharge against medical advice.[5]

54. It would not result in an undue burden in the nature of Defendant WCC's services, programs, or activities or an undue financial and administrative burden for Defendant to provide in-person interpreters during Plaintiffs medical treatment at WCC. (WCC Response to Request for Admission No. 10).

55. Joseph Giterman made a request for American Sign Language interpreter services on behalf of Plaintiff in the afternoon of July 9, 2014.[6]

56. Plaintiff signed a Consent for Physician Care form and a Financial Consent to Ancillary Services form on admission without an interpreter present.[7]

---

[5] Defendant WCC does not dispute this fact, but notes that Ms. Sebatianelli was hired by WCC in 2016, when a new process was instituted for interpreting services.

[6] Plaintiff does not dispute this fact. Plaintiff notes, however, that Joseph Giterman made more than one request including a request that is reflected in Plaintiff's medical records from July 8, 2014 at 9:10 indicating: "Patient has son who uses sign language to communicate with patient. Son stated that he wants an interpreter present here each day to help his mother communicate." WCC00020

[7] Plaintiff does not dispute this fact, but notes that WCC did not provide an interpreter for Plaintiff at any time throughout her stay and that Plaintiff was required to sign additional forms, including discharge paperwork.

**C.    A brief description of damages, including, where applicable**

**Damages Sustained As a Result of PMC's Discrimination:**

**(1) Principal injuries sustained:** PMC's discrimination against Plaintiff and

refusal to ensure effective communication for Plaintiff during her March 8, 2014,

and July 3, 2014 to July 8, 2014 hospital stays, caused Plaintiff to suffer emotional

distress. Plaintiff's inability to fully understand her diagnosis and treatment, to

provide informed consent, and to effectively communicate her needs to PMC's

staff caused Plaintiff to endure emotional distress in the form of, *inter alia*,

humiliation, fear, and anxiety. PMC's deliberate indifference in, *inter alia*, failing

to provide necessary interpreters and functioning VRI machines, and at times,

relying on her son Joseph Giterman and friend Sharon Antal to interpret in lieu of

qualified interpreters, was the proximate cause of her emotional distress.

**(2) Hospitalization and convalescence:** Plaintiff did not seek medical or

psychological treatment for injuries sustained as a result of Defendants'

discrimination. Plaintiff notes that the fact that Plaintiff recovered from her

physical injury for which she sought treatment at PMC and WCC is irrelevant to

the issue of whether she sustained emotional distress damages. *See Silva v. Baptist*

*Health S. Fla., Inc.*, 856 F.3d 824 (11th Cir. 2017).

**(3) Present disability:** Plaintiff will testify that she continues to experience

emotional distress as a result of PMC's discrimination.

**(4) Special monetary damages, loss of past earnings, medical expenses,**

**property damages, etc.:** Plaintiff seeks compensatory damages under the RA for

the emotional harm caused by PMC's discrimination. 29 U.S.C. § 794(a). These

damages include emotional distress damages. *See e.g. Sumes v. Andres*, 938 F.

Supp. 9, 13 (D.D.C. 1996); *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d

1173, 1198 (11th Cir. 2007) (holding that a "subset of compensatory damages—

non-economic compensatory damages—is available under § 504 of the

Rehabilitation Act for intentional discrimination"); *Toth v. Barstow Unified Sch.

Dist.,* 2014 U.S. Dist. LEXIS 169669, *7-8 n. 11 (C.D. Cal. Dec. 8, 2014)

("Compensatory damages, under § 504 of the Rehabilitation Act, include

emotional distress damages.).

Plaintiff also seeks nominal damages in the event she does not prove

compensatory damages. *Tolbert v. Queens College*, 242 F.3d 58, 74 (2d Cir. 2001)

(holding, in discrimination suit brought under Title VI of the Civil Rights Act, that

"a plaintiff who has proven a civil rights violation, but has not proven actual

compensable injury, is entitled as a matter of law to an award of nominal

damages"); *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn*, 280 F.3d 98, 110–11

(2d Cir. 2001) (the RA incorporates the remedial scheme of Title VI of the Civil

Rights Act).

**(5) Estimated value of pain and suffering, etc.:** Damages for emotional distress are not easily quantifiable and should be determined by the trier of fact based on Plaintiff's testimony and the objective circumstances of the civil rights violation to be proven. *See e.g. Williams v. Blvd. Lines, Inc*., No. 10 Civ. 2924, 2013 U.S. Dist. LEXIS 149707, at *18–19 (S.D.N.Y. Sep. 30, 2013); *Williams v. Trader Publishing Co*., 218 F.3d 481, 486 n.3 (5th Cir. 2000).

**(6) Special damage claims: N/A**

**<u>Damages Sustained As a Result of WCC's Discrimination:</u>**

**(1) Principal injuries sustained:** WCC's deliberate indifference to Plaintiff's rights in failing to ensure effective communication with Plaintiff during her rehabilitative stay caused Plaintiff to suffer emotional distress. Plaintiff's inability to communicate her medical needs to WCC's staff, including effectively conveying her pain levels and understanding her medication dosages, caused Plaintiff to suffer emotional distress in the form of *inter alia*, feeling ignored, frustration, and anger.

**(2) Hospitalization and convalescence:** *See above*

**(3) Present disability:** Plaintiff will testify that she continues to experience emotional distress as a result of WCC's discrimination.

**(4) Special monetary damages, loss of past earnings, medical expenses, property damages, etc.:** *See category (4) above*

**(5) Estimated value of pain and suffering, etc.:** To be determined by the trier of

fact

**(6) Special damage claims:** N/A

**E. Names and addresses of witnesses, along with the specialties and qualifications**

      Plaintiff intends to call the following witnesses against Defendant Pocono

Medical Center:

| WITNESS | SUMMARY OF QUALIFICATIONS |
|---|---|
| Svetlana Giterman<br>55 Tallow Drive<br>Blakeslee, Pennsylvania 18610 | Plaintiff Svetlana Giterman will testify, *inter alia,* to her experiences at PMC during her March 8, 2014 and July 3 to July 8, 2014 hospital stays, her unheeded requests for interpreters, PMC's failure to provide a functioning VRI machine, the fact that she was forced to rely upon her son and Sharon Antal as interpreters against her wishes, and the lack of effective communication with PMC staff during key medical interactions such as diagnosis, treatment, and obtaining informed consent. Ms. Giterman will testify that PMC's failure to ensure effective communication during her stays and deliberate indifference to her rights caused her to suffer emotional distress. |

| | |
|---|---|
| Joseph Giterman<br>55 Tallow Drive<br>Blakeslee, Pennsylvania 18610 | Plaintiff's son, Mr. Giterman, will testify to his knowledge of the facts in the complaint, including *inter-alia*, requests he made on behalf Plaintiff's behalf for an interpreter, the malfunctioning VRI, and the fact he did not consent to being used as an interpreter for his mother. Mr. Giterman may also testify to his knowledge of emotional harm suffered by Plaintiff as a result of PMC's discriminatory acts. |
| Sharon Antal<br>232 Quiet Valley Road<br>Stroudsburg, Pennsylvania 18360 | Ms. Antal will testify to his knowledge of the facts in the complaint, including *inter-alia*, requests she made on behalf Plaintiff's behalf for an interpreter, and the malfunctioning VRI machine. Ms. Antal may also testify to her knowledge of emotional harm suffered by Plaintiff as a result of PMC's discriminatory acts. |
| Mary Jackson<br>Director of Care Coordination<br>Lehigh Valley Pocono<br>206 East Brown Street,<br>East Stroudsburg,<br>Pennsylvania | Ms. Jackson, Director of Care Coordination at PMC and PMC's corporate representative, is expected to testify regarding Defendant's policies, procedures, and training of staff pertaining to the provision of interpreters and other auxiliary aids for deaf and hard of hearing patients |
| Dr. Stefan Sinco<br>45 Ivan Allen Jr. Boulevard NW<br>Unit 2503<br>Atlanta, Georgia 30308 | Dr. Sinco, Ms. Giterman's treating surgeon is expected to testify as to his knowledge of the allegations in the complaint, and his knowledge of training on PMC's policies and procedures |

| | |
|---|---|
| | pertaining to the provision of interpreters and other auxiliary aids for deaf and hard of hearing patients. |
| Elizabeth Felletter<br>3432 Key Court, Effort, Pennsylvania 18353 | Elizabeth Felletter, a case manager in charge of discharge planning at PMC, is expected to testify regarding her knowledge of the allegations in the complaint, to entries in the medical record, and to her training on PMC's policies and procedures pertaining to the provision of interpreters and other auxiliary aids for deaf and hard of hearing patients. |
| Michael Hennigan<br>86 Broad Street<br>No. 5,<br>Stroudsburg, Pennsylvania 18360 | Registered Nurse Michael Hennigan is expected to testify to his knowledge of the facts in the complaint, to entries in the medical record, and to his training on PMC's policies and procedures pertaining to the provision of interpreters and other auxiliary aids for deaf and hard of hearing patients. |

| Kelly Gillick<br>Director of Service Excellence<br>and Patient Relations<br>Lehigh Valley Pocono<br>206 East Brown Street,<br>East Stroudsburg,<br>Pennsylvania<br>*May Call* | Ms. Gillick, Director of Service Excellence and Patient Relations and PMC's corporate representative, may testify to Defendant's policies, procedures, and grievances procedure. |

Plaintiff intends to call the following witnesses against Defendant

Whitestone Care Center:

| WITNESS | SUMMARY OF QUALIFICATIONS |
| --- | --- |
| Svetlana Giterman<br>55 Tallow Drive<br>Blakeslee, Pennsylvania 18610 | Plaintiff Svetlana Giterman will testify, *inter alia,* to her experiences at PMC during her rehabilitative stay, WCC's failure to provide her with an interpreter despite her requests, and the lack of effective communication with PMC staff during key medical interactions such as therapy sessions, assessment of pain levels, and her discharge against medical advice. Ms. Giterman will testify that WCC's failure to ensure effective communication during her stays and deliberate indifference to her rights caused her to suffer emotional distress. |
| Joseph Giterman<br>55 Tallow Drive<br>Blakeslee, Pennsylvania 18610 | Plaintiff's son, Mr. Giterman, will testify to his knowledge of the facts in the complaint, including *inter-alia*, requests he made on behalf Plaintiff's behalf for an interpreter and emotional distress |

| | |
|---|---|
| | suffered by Plaintiff as a result of WCC's discriminatory acts. |
| Sharon Antal<br>232 Quiet Valley Road<br>Stroudsburg, Pennsylvania 18360 | Ms. Antal will testify to her knowledge of the facts in the complaint, including *inter-alia*, her knowledge of emotional harm suffered by Plaintiff as a result of WCC's discriminatory acts. |
| Marlene Sebastianelli<br>1540 Main Street<br>Peckville, Pennsylvania 18452 | Ms. Sebastianellis, as Administrator of Sable Healthcare, Whitestone Care Center, and Defendant's corporate representative, is expected to testify to Defendant's policies, procedures, and training of staff pertaining to the provision of interpreters and other auxiliary aids for deaf and hard of hearing patients. |

Plaintiff also reserves the right, in the event that any witness is unexpectedly unavailable to testify at trial, to designate testimony relating to that witness. Plaintiff reserves the right to use any portion of any deposition transcript for purposes of impeachment or rebuttal. Plaintiff further reserves the right to read the testimony of Defendant's 30(b)(6) witnesses: Mary Jackson and Kelly Gillick (PMC), and Marlene Sebastianelli (WCC), pursuant to Fed. R. Evid. 32(3).

**D.    Summary of testimony of each expert witness**

Plaintiff intends to call the following expert witness:

| WITNESS | SUMMARY OF QUALIFICATIONS |
|---|---|
| Judy Shepard- Kegl, Ph.D | Dr. Shepard-Kegl will testify as to her expert opinion of Plaintiff's American Sign Language |

| | |
|---|---|
| 96 Falmouth Street (P.O. 9300) Portland, Maine 04104 | and English communication (ASL) skills; her need for an ASL interpreter to communicate effectively in a medical setting; and her reading, writing, and lipreading abilities. She will also testify as to the functionality and appropriateness of particular auxiliary aids including VRI technologies, and interpreters within the medical context. |

For reasons more fully articulated in Plaintiff's motions to exclude, Plaintiff objects to the introduction of the testimony and expert reports of Defendants' retained experts Robert J. Spinelli and Louis Sieminski. *See* ECF 96 & 97.

**E. Special comment about pleadings and discovery, including depositions and the exchange of medical reports**

All depositions and discovery have been completed in this matter.

**F. A summary of legal issues involved and legal authorities relied upon**

The crux of Plaintiff's legal claims is that both Defendants, with deliberate indifference to Plaintiff's federally protected rights, failed to ensure effective communication with Plaintiff during Plaintiff's stays at their facilities, and failed to provide her with meaningful access to the benefits of their treatment. For a more detailed discussion of the legal issues in this case, Plaintiff directs the Court to its Brief in Support of its Cross-Motion for Summary Judgment and Reply Briefs (ECF 67, 86, 87). Nonetheless, Plaintiff has summarized the major legal issues and legal authorities relied upon below.

**Elements of Rehabilitation Act Claim**

Section 504 states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). In order to succeed on her claim under Section 504 of the RA, Plaintiff must prove that (1) she is disabled; (2) that the Defendants receive federal financial assistance; and (3) the Defendants discriminated against her by denying her a full and equal opportunity to enjoy the services that the Defendants provide. 29 U.S.C. § 794(a); *see Reed v. Schuylkill Health System*, 2013 WL 647912729, *3 (M.D.Pa. Dec. 9, 2013); *McNelis v. Pa. Power & Light Co*., 867 F.3d 411, 414 (3d Cir. 2017) (noting RA and ADA impose essentially the same standards on covered entities). Here, it is undisputed that Plaintiff is disabled within the meaning of the Act and that Defendants receive federal funds. Plaintiff contends, however, that PMC and WCC failed to ensure that Plaintiff was provided with effective communication during her treatment at Defendants' facilities.

## Compensatory Damages/Deliberate Indifference

In order to recover compensatory damages under Section 504 of Rehabilitation Act, Plaintiff must prove that Defendant discriminated against her with deliberate indifference to her civil rights. *See D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 269 (3d Cir. 2014); *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 260 (3d Cir. 2013). Plaintiff "must present evidence that shows both: Defendants' "(1) *knowledge* that a federally protected right is substantially likely to be violated . . . , and (2) *failure to* act despite that knowledge." *Cent. Dauphin Sch. Dist.*, 765 F.3d at 269. Plaintiff contends that Defendants' failure to assess her communication needs, failure to provide necessary auxiliary aids and services to ensure effective communication and failure to implement and follow policies to ensure the same, amounted to deliberate indifference under the law.

## Effective Communication in a Medical Setting

"To be ineffective communication, it is sufficient if the patient experiences a real hindrance, because of her disability, which affects her ability to exchange material medical information with her health care providers." *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 835 (11th Cir. 2017). According to the RA regulations, entities "shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." 45 C.F.R.

§84.52(d)(1). Healthcare entities are prohibited from providing services that are "not equal to that offered nonhandicapped persons; . . . not as effective as the benefits or services provided to others; . . . [or] provide benefits or services in a manner that limits or has the effect of limited the participation of qualified handicapped persons." 45 C.F.R. §84.52(a)(2)-(4). The law recognizes that provision of auxiliary aids "may include . . . interpreters and other aids for persons with impaired hearing". 45 C.F.R. §84.52(d)(3). Also, whether a certain communication method provides for *effective communication* depends entirely on context: "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and *the context in which the communication is taking place."* 28 C.F.R. § 36.303 (emphasis added); *see e.g. Duffy v. Riveland*, 98 F.3d 447 (9th Cir. 1996) *Liese v. Indian River Cty. Hosp. Dist*., 701 F.3d 334, 343 (11th Cir. 2012) ("[S]urgery is often a complicated concept to convey to a person who can hear well; the attendant risks, manner of surgery, prognosis, and advantages or disadvantages of immediate or postponed surgery can only complicate this communicative task….., auxiliary aids limited to written notes, body gestures, and lipreading may be ineffective in ensuring that a hearing-impaired patient receives equal opportunity to benefit from the treatment"). ("Although in some

circumstances a notepad and written materials may be sufficient to permit effective

communication, in other circumstances they may not be sufficient. For example, a

qualified interpreter may be necessary when the information being communicated

is complex, or is exchanged for a lengthy period of time."); Title III regulations

instructively explain circumstances where an interpreter would be necessary:

> Exchange of notes likely will be effective in situations that do not
> involve substantial conversation, for example, when blood is drawn
> for routine lab tests . . . . However, interpreters should be used when
> the matter involves more complexity, such as in communication of
> medical history or diagnoses, in conversations about medical
> procedures and treatment decisions, or in communication of
> instructions for care at home . . ."

28 C.F.R. Pt. 36, App. A. Here, the evidence at trial will show that Defendants'

staff reliance on written notes was not effective.  In a medical setting, the RA

focuses "not on quality of medical care or the ultimate treatment outcomes, but on

the *equal opportunity to participate in obtaining and utilizing services." Id.* As the

*Silva* court explained:

> [R]egardless of whether a patient ultimately receives the correct
> diagnosis or medically acceptable treatment, that patient has been
> denied the equal opportunity to participate in healthcare services
> *whenever he or she cannot communicate medically relevant
> information effectively with medical staff*. It is not dispositive that the
> patient got the same ultimate treatment that would have been obtained
> even if the patient were not deaf. . . . Instead, what matters is whether
> the handicapped patient was afforded auxiliary aids sufficient to ensure
> *a level of communication about medically relevant information
> substantially equal to that afforded to nondisabled patients*

*Id.* at 834 (emphases added) (citations omitted). Plaintiff contends that the methods of communication relied on by Defendants including forced lip-reading, writing, gesturing, and in the case of PMC, a malfunctioning VRI machine were not effective auxiliary aids to ensure effective communication, and that an interpreter was necessary for her to have effective communication in a medical setting. Further, Plaintiff contends that whether or not she received adequate medical care to recover from her injuries is wholly irrelevant to the inquiry of whether she able to meaningfully participate in and understand her care at Defendants' facilities.

## **VRI Issues**

Hospitals are permitted to use VRI services to deliver qualified interpreters, but only if such services result in effective communication. 45 C.F.R. §84.52(d)(3) ("auxiliary aids may include . . . interpreters and other aids"); *see also* 28 C.F.R. § 36.303(b)(1); 28 C.F.R. § 36.104. The DOJ regulations instruct that the use of VRI must meet certain performance standards:

> (f) Video remote interpreting (VRI) services. A public accommodation that chooses to provide qualified interpreters via VRI service shall ensure that it provides –
>
>> (1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;

(2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position;

(3) A clear, audible transmission of voices; and

(4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI.

28 C.F.R. § 36.303(f). A VRI system that does not meet all of these standards is not an "effective method[] of making aurally delivered materials available to individuals with hearing impairments," meaning a non-compliant VRI system does not count as an auxiliary aid or service. 42 U.S.C. § 12103(1)(A); 28 C.F.R. § 36.104; 28 C.F.R. Pt. 36 App. A ("To ensure that VRI is effective, the Department has established performance standards for VRI in § 36.303(f). The Department recognizes that reliance on VRI may not be effective in certain situations, such as those involving the exchange of complex information or involving multiple parties . . . and using VRI in those circumstances would not satisfy a public accommodation's obligation to provide effective communication."). In Ms. Giterman's case, PMC staff, at times during both of her March and July visits, attempted to rely upon a malfunctioning VRI machine to communicate with Ms. Giterman. While the law permits hospitals to use a functioning VRI machine, where appropriate and effective, to facilitate communication, the VRI provided to Ms. Giterman by PMC failed to provide

effective communication. Ms. Giterman and her companions repeatedly notified and alerted PMC staff to the problems with the VRI and asked for a live interpreter. Nonetheless, PMC's staff failed to implement any alternative measures. *Sunderland v. Bethesda Hosp., Inc.*, 686 F. App'x 807, 2017 U.S. App. LEXIS 7417 (11th Cir. 2017) ("The evidence indicates that the nurses, knowing the patients required an interpretive aid, relied on the VRI to facilitate communication with the patients; were put on notice that the VRI was not accommodating the patients; and chose to persist in using the VRI without correcting its deficiencies. . . . In other words, the evidence supports a finding that the nurses disregarded a substantial risk that the patients were being denied effective communication."). Based on these facts, a jury can find that PMC acted with deliberate indifference.

### Improper Reliance on Joseph Giterman as an Interpreter

Entities are liable where they fail to provide requisite auxiliary aids and limit a disabled person's enjoyment of the opportunities by requiring a patient's companion to serve as an interpreter. 45 C.F.R. §84.52(d)(3). As such, requiring a disabled patient to bring her own interpreter is inappropriate. As instructed by Title III regulations, it is unlawful for entities to "requi[ing] an individual with a disability to bring another individual to interpret for him or her," because it fails to afford the disabled individual with a right to independence and privacy which are enjoyed by other non-disabled patients in a medical setting. 28 C.F.R. 36.303(c). The DOJ

further instructs that rely[ing] on an adult accompanying an individual with a disability to interpret or facilitate communication is improper, unless there was an emergency[8] *involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available*," 28 C.F.R.  36.303(c)(3)(i) (emphasis added), or upon a specific request of the individual.  28 C.F.R. 36.303(c)(3)(ii); s*ee Silva*, 856 F.3d at 837 n.9. ("[i]t is no answer to say that hospital staff relied on [the deaf patient's] father to communicate effectively with [the deaf patient]…. reliance on a family member for interpretive assistance is not an adequate substitute for an appropriate auxiliary aid—in this case, the VRI machine—when it malfunctions."). Here, the evidence at trial will show that Ms. Giterman expressly did not consent to the use of her family members or friends as interpreters and that, at times, Defendants left her with no choice but to rely on her son Joseph Giterman to interpret, in violation of ADA regulations and Defendants' policies.

**Failure to Assess Ms. Giterman's Communication Needs**

In *Pierce v. Dist. of Columbia*, 128 F. Supp. 3d 250 (D.D.C. 2015)*,* the court found that the defendant acted in violation of the law with deliberate indifference,

---

[8] The Department of Justice Guidance on Title III's Regulations has explained that, while "[a]rguably, all visits to an emergency room are by definition emergencies," the "imminent threat" language is "not intended to apply to typical and foreseeable emergency situations that are part of the normal operations of these institutions." 28 C.F.R., pt. 36, App. A at 773. Accordingly, a hospital may only rely on an accompanying individual to interpret, "where there is a true emergency, i.e., where any delay in providing immediate services to the individual could have life-altering or life-ending consequences." *Id.*

where both Defendants failed to adequately assess Ms. Giterman's communication needs:

> [W]hen [Plaintiff] first arrived at the …. facility, the …. employees …. did nothing to evaluate [her] need for accommodation, despite their knowledge that [s]he was disabled. They did not ask [Plaintiff] what type of auxiliary aids [s]he needed. They did not hire an expert to assess [Plaintiff's] ability to communicate through written notes or lip-reading as opposed to sign language. They did not even consult their own policies to figure out what types of accommodations are ordinarily provided to [patients] with hearing disabilities. Instead, they figuratively shrugged and effectively sat on their hands with respect to this plainly hearing-disabled person in their custody, presumably content to rely on their own uninformed beliefs about how best to handle [her] and certainly failing to engage in any meaningful assessment of his needs.

*Id.* at 269–70. "[W]hen an entity is on notice of the need for accommodation, it 'is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation.'" *Updike v. Multnomah Cty.,* 870 F.3d 939 (9th Cir. 2017) (*quoting A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1207 (9th Cir. 2016)); *see Lovell v Chandler*, 303 F.3d 1039, 1044 (9th Cir. 2002) (finding deliberate indifference where State excluded disabled individuals from insurance programs due to their disabilities); *K.G. v. Santa Fe Pub. Sch. Dist.*, No. CIV 12-1209 KBM/GBW, 2014 U.S. Dist. LEXIS 190265, at *57 (D.N.M. Nov. 17, 2014) (finding sufficient evidence to create a genuine question of material fact as to whether School was deliberately indifferent in failing to act to provide reasonable accommodations to needs of physically disabled student); *Button* v. *Bd. of Regents*

*of Univ.*, 289 F.2d 964, 968 (9th Cir. 2008). While *Pierce, Updkike, Lovell, and Button,* arise from a deaf individual's failure to accommodate claim under Title II, the rationale is still instructive to the jury's determination of deliberate indifference in the instant case. Here, while both Defendants have admitted that staff were aware that Ms. Giterman was deaf, both PMC and WCC failed to conduct a proper assessment of Ms. Giterman's communication needs, and flatly ignored her requests for an interpreter.

Moreover, Hospitals that provide emergency healthcare must "establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care." 45 C.F.R. §84.52(c). Hence, PMC would be liable for failing to establish a procedure to properly assess and provide the necessary communication aids for a deaf individual.

**<u>Subjective Beliefs of Staff are Not Dispositive Evidence</u>**

Both Defendants have indicated that their own staff members believed that they were able to communicate with Ms. Giterman through the methods of communication used, including pen and paper and lipreading. However, the subjective beliefs of staff are not relevant or dispositive to the jury's inquiry of whether effective communication was provided. *See Van Vorst et al. v. Lutheran Healthcare*, No. 15-cv-1667, at 5 (finding defendant hospital "misses the mark" in relying on medical records and testimony of hospital staff indicating that Plaintiff

was able to communicate effectively via written notes, speech, and lip reading, where Plaintiff testified she did not understand without an interpreter); *Borngesser v. Jersey Shore Med. Ctr.*, 774 A.2d 615, 621 (N.J. App. Div. 2001) (holding that whether hospital staff thought communication was effective is irrelevant; the RA inquiry must focus "upon the qualified handicapped person and whether, objectively, he or she in fact had sufficient communication with the recipient so as to have understood what was occurring and to be able to participate in and benefit from the federally funded services, as much as a similarly situated non-handicapped person could have"); *see also* ECF 88 ("the subjective beliefs of the staff at PMC and WCC noted in their medical records that plaintiff understood what she was being told about her treatment through auxiliary aids are not determinative as to whether she truly understood").

## Failure to Implement and Comply with Policies to Ensure Protection of Rights of Deaf and Hard-of Hearing

The jury may find that Defendants acted with deliberate indifference in failing "to follow its own policy regarding [c]ommunication [a]ccommodations for [d]eaf and [h]ard of [h]earing patients." *Falls v. Prince George's Hosp. Ctr.,* No. 97-cv-1545, 1999 U.S. Dist. LEXIS 22551, at *32 n.10 (D. Md. Mar. 16, 1999); *see Crane v. Lifemark Hosps., Inc.,* No. 16-17061, 2018 U.S. App. LEXIS 21465, *10 (11th Cir. Aug. 2, 2018); *c.f. Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009); *Pierce*, 128 F.Supp.3d at 270. The mere existence of a policy—no matter

how good that policy is in theory—does not preclude a finding of deliberate indifference if employees are not adequately trained on that policy, or if they fail to follow it for some other illegitimate reason. *Loeffler*, 582 F.3d at 276–77.

### *Pocono Medical Center Issues*

Although PMC has a written policy indicating that interpreters must be provided for certain medical interactions and/or upon request, the record demonstrates that this policy is not well-implemented and was not followed by the staff that interacted with Ms. Giterman. For example, it is unknown whether PMC provides an interpreter for a patient's initial assessment. While PMC has a written contract for live, in-person interpreters, it was not utilized in this case. The record also demonstrates that PMC's staff are not well-trained on what to do in the event of VRI malfunction. Additionally, PMC's staff lack regarding any specific policies pertaining to the ordering of interpreting and the appropriateness of the use of family, friends, and companions as interpreters.

### *Whitestone Care Center Issues*

The record demonstrates that WCC's policies and procedures regarding its assessments of deaf resident's communication needs and its provision of auxiliary aids and services to deaf residents are severely deficient. Moreover, where WCC does have policies in place, WCC administrators and staff are unaware of their

policies and how to comply with them. WCC's procedure for obtaining an in-person interpreters has, perhaps, never even been put into practice, and is at best, loosely defined. WCC has an "arrangement" through East Stroudsburg University for a professor to provide free interpreting services but staff never been trained on how to use the interpreter services. Moreover, Marlene Sebastianelli, the Administrator of Sable Healthcare, Whitestone Care Center, and WCC's highest ranking official, was unaware if such arrangement was even still in effect. Instead of conducting a fact-specific inquiry to assess a deaf individual's communication needs and preferences, WCC allows its staff members to determine whether communication with a deaf-individual is "functioning well." While WCC has a *written* policy prohibiting the use of family members as interpreters, absent specific consent from the resident, WCC staff and administrators are not trained on this policy. Taken together, the jury may determinate that WCC's failure to implement adequate policies, procedures, and training protocols to ensure effective communication amounts to deliberate indifference.

## I.    Stipulations desired

The parties have agreed to stipulate to the foundation and authentication of medical records (subject to Plaintiff's proposed redactions of lay opinion testimony and irrelevant visits).

Plaintiff desires to have a number of Defendants' Discovery Responses be read to the jury, including the following:

*Pocono Medical Center*

1. Defendant PMC does not provide forms for deaf and hard of hearing patients or companions to request and/or decline auxiliary aids and services. (PMC Response to Request for Admission No. 11).

2. Providing interpreters to Plaintiff during her March and July 2014 visits to PMC would not have constituted an undue burden to PMC. (PMC Response to Request for Admission No. 13)

3. PMC's employees and staff knew that Plaintiff is deaf. (PMC Response to Request for Admission No. 12).

4. During Plaintiff's March 8, 2014 visit to PMC, Plaintiff's son Joseph Giterman, alerted PMC staff to Ms. Giterman's deafness. (PMC Interrogatory Response No. 12).

5. During Ms. Giterman's July 3, 2014 visit, PMC's staff knew that Plaintiff was deaf upon admission. (PMC Interrogatory Response No. 12).

*Whitestone Care Center*

1. Defendant Whitestone Care Center is a recipient of federal financial assistance. (Response for Request for Admission No. 18).

2. Defendant Whitestone Care Center's staff were made aware that Plaintiff was deaf upon Plaintiff's admission. (WCC Response to Interrogatory No. 9).

3. It would not result in an undue burden in the nature of Defendant WCC's services, programs, or activities or an undue financial and administrative burden for Defendant to provide in-person interpreters during Plaintiffs medical treatment at WCC. (WCC Response to Request for Admission No. 10).

4. Defendant WCC does not provide forms for deaf and hard of hearing patients or companions to request and/or decline auxiliary aids and services. (WCC Response to Request for Admission No. 8).

5. Joseph Giterman made a request for American Sign Language interpreter services on behalf of Plaintiff. (WCC Interrogatory Response No. 12)

6. Plaintiff left WCC against medical advice (WCC Interrogatory Response No. 15).

7. Plaintiff signed consent forms at WCC without an interpreter present. (WCC Response to Request to Admit No. 19).

Plaintiff reserves the right to move to admit further admissions and interrogatories pursuant to applicable federal rules that are not listed above.

**J.     Estimated number of trial days**

      7-10 days

**K. Any other matter pertinent to the case to be tried**

      Plaintiff reserves the right to enter any exhibits on Defendant's list of Exhibits into her case-in-chief. Plaintiff further reserves the right to raise objection to Defendants' listed exhibits and to file additional motions *in limine* as necessary based on Defendants' Pre-Trial Memoranda.

**L. Pursuant to Local Rule 16.3 append to this memorandum a pre-numbered schedule of exhibits, with brief identification of each, on the clerk's Exhibit Form**

      Attached hereto is a pre-numbered list of exhibits. Plaintiff further reserves the right to introduce other exhibits not on her list for purposes of establishing evidentiary foundation, the authentication of evidence, impeachment and/or rebuttal.  Plaintiff reserves the right to introduce additional exhibits in the form of deposition transcripts, should any witnesses prove to be unavailable at the time of trial. Plaintiff also reserves the right to prepare and designate demonstrative exhibits for use at trial.

**M. Append any special verdict questions which counsel desires to submit)**

See attached

**N. Defense counsel must file a statement that the person or committee with settlement authority has been notified of the requirements of and possible sanctions under Local Rule 16.2**

Not applicable

**O. Certificate must be filed as required under Local Rule 30.10 that counsel have met and reviewed depositions and videotapes in an effort to eliminate irrelevancies, side comments, resolved objections, and other matters not necessary for consideration by the trier of fact**

Subject to this court's approval, the parties have agreed to exchange deposition designations to be used at trial by <u>March 29, 2018</u>. The parties have also agreed to submit any objections to such deposition designations by <u>April 5, 2019</u>, and to meet and confer to resolve and eliminate irrelevancies, side comments, resolved and objections by <u>April 5, 2019</u>.

**P. In all trials without a jury, requests for findings of both fact and law shall be submitted with this Memorandum as required under Local Rule 48.2.**

Not applicable

By:
<u>/s/ Andrew Rozynski</u>
Andrew Rozynski
**EISENBERG & BAUM, LLP**
24 Union Square East, Fourth Floor
New York, NY 10003
*Attorneys for Plaintiff*